May it please the court, my name is David Landry, I represent the petitioner Mr. Martin. We'll reserve two minutes for rebuttal. Can you bring the mic a little closer? Oh, I'm sorry. Is this better? Good. I'm sorry, Your Honor. No, that's fine. Go ahead. Okay. Should I begin again? Sure. Okay. My name is David Landry. I represent the petitioner Mr. Martin. I will reserve two minutes for rebuttal if that's all. Very well. Okay. Your Honors, the petitioner is before the court and requesting essentially two different things. First, the petitioner believes that the court should remand the case to the IJ level for the IJ to reply for the first time the board's decision in matter of Fernandez. In matter of Fernandez, the board decided that a notice to appear, which is the document that places the person into removal proceedings, if it's defective, if it lacks certain information, the alien can object to it and would give the option of the government, DHS, either refiling or allowing the case to be terminated. May I ask you about that because as you know, we've determined that the notice to appear is not jurisdictional, although that was, I appreciate, argued in your brief, but from reading the briefs, it seems that you didn't really exhaust the matter of Fernandez argument. Well, you're correct, Your Honor. The matter of Fernandez came out, was issued about a month after petitioner filed his brief with the board, and the board doesn't allow for supplemental briefing. So there was no physical way for the petitioner to say to the board, hey, look at Fernandez. It considered under these circumstances because that's not an option at the board. But it was an argument that could have been made before. I mean, the jurisdictional argument was kind of SOL given the precedent, but you could have made the matter of Fernandez argument, could you not? I did. The petitioner moved to terminate it at the IJ level. And in fact, the petitioner did it, although it's correct to say that at the very first hearing the petitioner did, or I shouldn't say the very first hearing, but ultimately before Perea was issued, the petitioner did essentially admit the factual allegations because he filed this by 589. However, Perea was issued in June of 2018, and the petitioner moved to terminate in December of 2018, and there were no proceedings between those two moments. So from the petitioner's perspective, the petitioner did move to terminate as soon as possible after Perea was issued. It would be our position that prior to the issuance of Perea, because of regulation controlled, the petitioner shouldn't have been held to need to file for the motion to terminate. And here I'm relying upon the Supreme Court's case in Reed v. Ross, because at the time before Perea issued its decision, the idea that the NTA would somehow be able to be challenged was really truly novel, and it wouldn't be reasonable under existing law at the time to expect the petitioner to have filed the motion to terminate. This issue actually was recently addressed by the Board in a case of Larios Gutierrez issued in November of this year, and I think the petitioner would assert that that decision is incorrect. In fact, petitioners asking the Court to issue a remand with language that clearly defines when it is that the petitioner, an alien, needs to object to. What is the timing of the objection? Fernandez gives us the wording of prior to the termination of the proceedings, but what does that mean? Does it mean termination throughout the proceedings, or does it mean on the day of that proceedings? Now, in Larios Gutierrez, the Board acknowledged that in matter of Rosales Vargas, which was from 2020, the petitioner, the alien in that case, he objected on the day of the individual hearing, and the Board found it to be fine that that was a timely objection. Now, Larios Gutierrez goes on to say, well, that was kind of dicta, and we're not really bound by it, but I think it isn't. And it follows the rule under Reed v. Ross in the U.S. Supreme Court that you can't expect the petitioner, the alien in this case, to make that objection prior to knowing that this was even an option. So we would ask the Court to remand with an order defining this, and we would assert that the definition should be any time after Perea was issued, because it's reasonable to believe that once the Supreme Court wrote, hey, this regulation is ultra-virus, that opened up the door then for other aliens to say, okay, now I have an opportunity to argue this before a judge. And that's exactly what the petitioner did. Could you entertain a question? I'm focusing now on the religious area, which I find of great interest in most all of these cases. But in looking, do you concede that there's no evidence in the record that Martin was actually targeted because of his monrays? You concede that? No. Where? Is it in the record? I didn't find it. I can appreciate that, Your Honor. When you're looking at these types of circumstances, the courts have told us we have to look at the totality of the circumstances as it exists in that country. And the petitioner is a member of a very, very, very small indigenous tribe. Less than 5% of the Guatemalan population speaks the language that he speaks. And because of that, because he's a member in this indigenous tribe, he was denied a job or education, which limited his ability to earn a living. So he was basically brought down to either doing manual labor and or driving. In his case, he chose the driving. He's really too old. He testified that he's really too old to be doing manual labor now upon return to Guatemala. When you look at the circumstance of Guatemala, you'll learn that the majority of the people travel by bus. It's not like in the United States where we wouldn't drive by car. I understand, but not specifically. There isn't anything in the record that because he was a mom that he was being targeted. I didn't find anything. Maybe it doesn't matter, but it strikes me as an important part of your argument. I understand, Your Honor. The premise would be that the circumstance that he found himself in because he was mom, because he suffers pervasive discrimination in Guatemala, being a member of the indigenous tribes, because he was denied an education, it created the circumstance where he was persecuted because he was a mom cab driver. So what you're saying is there's nothing in the record specifically saying that. It's by this chain of argument you get to that point, and that's what you're going to have to rely on. Yes, you are correct, Your Honor. So what you're really saying is because he was limited in his occupation, and of course an occupation can change unlike his mom identity, you're saying it basically collapses in this case as a matter of practicality? It does, Your Honor, and the board denied the petitioner's claim. It's sort of the IJ based upon the board's decision in matter of a costa. In matter of a costa, it dealt with cab drivers in El Salvador, and the court said, well, you know, he could do something else. He could be something other than being a cab driver. And in fact, the petitioner in a costa said, well, I'm not even going to do that anymore because it doesn't pay anymore. But the situation is very different for the petitioner in a costa than it is here for this petitioner. These were obviously different countries, so we have to look at the conditions in that particular country. And like I was saying before, in Guatemala, the primary form of transportation is by bus. Alternatively, it's by motorcycle. So there are very, very, very few people that own cars in Guatemala. And really, driving a bus and or driving a car is really a specialized skill. And here I bring the court to the Night Circus case in Contra, Planeanart, Saucedo from 2022. In that case, it dealt with a Mexican nurse, and the cartels had taken the Mexican nurse and used the Mexican nurse's skills to help heal some cartel members. And in that case, the court said, well, although it's true that she could change her profession, but even if she changes her profession, she's still a nurse because it is a specialized skill. Petitioner would assert that being a bus driver and or a cab driver in Guatemala really is a specialized skill. Very, very, very few people do it. Petitioner would be returning to his mom-speaking area in Todos Santos. And it's true in his application at page 319, he does say that upon return, his options would either be farming or driving people around, giving people a ride. So, but in application, working on a farm doesn't pay a livable wage. And you can find that in the record at, I'll give that site in just a second. Here we go, page 360 of the record. So he's no longer physically capable of doing the manual labor that he did before. He doesn't have the education because he's been denied an education because of his indigenous status. So he really only has this one option, and that one option places him in danger, as it has every time he's ever done that job. And with that, we'll submit. And I'll go ahead and give you two minutes for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, Roberta Roberts on behalf of the Attorney General of the United States of America. Is there an Attorney General right now, or do we have an acting Attorney General? Your Honor, currently the current Attorney General is still the Attorney General, as of today's date, Your Honor. Okay, thank you. Thank you. So, Your Honors, this record does not compel a contrary conclusion to the agency's findings on several dispositive grounds, any of which the Court could and should use to deny the petition. First, starting with Petitioner's argument about demonstrating a nexus between his race and the harm that he suffered. Petitioner did not meet his burden to demonstrate that his being mom was the reason why he was targeted. Instead, the record evidence shows that he was targeted because he was a cab or bus driver, but not specifically because he was mom. Indeed, the record evidence shows that cab and bus drivers in Guatemala are often targeted for extortion and for robberies. So what we have here is the targeting is not because of a protected ground of race, but because of someone working in the transportation sector. As was discussed, working in the transportation sector, a person's occupation is not an immutable characteristic. It is something that can be changed. What would happen if the only people who were bus drivers or cab drivers were mom? Would the standard change and, in effect, you would collapse the racial issue with the occupational issue? Your Honor, the petitioner would have to show that the drivers were being targeted also because they are mom, even if it turned out that all of the cab drivers or bus drivers were of a particular race. It has to be shown that they are targeted because of their race and not just because of their occupation. And here we don't have that distinction. Here it is clear that he is being targeted because of his occupation as a cab and bus driver. Now, two petitioners' example about the case where the nurse was targeted because of the specialized skills that she had as a nurse. In that case, it is clear that the nexus was because of her specialized skills, because she was targeted to use her nursing skills to heal or, you know, to provide medical assistance to, you know, the cartel members. However, here we don't have that same situation. The petitioner's, quote, unquote, specialized skills, if we were to consider driving to be a specialized skill, petitioner was not targeted because he could drive. The people who took his money did not, you know, require his special skills of driving for some other purpose. Instead, it was simply a matter of taking the money that petitioner had because petitioner was driving the bus or driving the cab. Indeed, petitioner also testified to an instance where 35 other bus passengers were also robbed during this incident. And that also goes to show that, unfortunately, there is just generalized societal crime that occurs in Guatemala, specifically also on public transportation. But, again, that does not show that petitioner was targeted because of his race. Also, the 35 passengers that were also robbed on the bus, there's no mention that they were of the mom race as well. Additionally, petitioner's testimony does not indicate that the people who robbed them said anything about his mom race or ethnicity or it doesn't say that they made any disparaging remarks about his mom race or ethnicity as well. So the record just does not show any nexus between race and the harm that he suffered. And that also goes to the issue of whether petitioner proffered a cognizable particular social group. Again, mom, cab, and bus drivers would not be a cognizable particular social group because being a cab or bus driver is a mutable characteristic, as has already been established. And, indeed, petitioner has already changed his occupation. He is no longer a cab or bus driver. In the United States, he has done manual labor even in his 60s. He was in his 60s at the time of the hearing and he was doing gardening work and, you know, laying pavement and patios and gardening. So even still, he actually has shown that he has other skills other than bus driving and, indeed, could use other skills if returned to Guatemala. So that also is additional record evidence that shows that petitioner did not meet his burden to show that it would be unreasonable to expect him to return to Guatemala. Additionally, to touch on- Can I entertain a question? I don't mean to interrupt, but while you're on this particular subject, there's something that was concerning me. He's living prior to his coming to the United States in Guatemala, which is a Spanish-speaking country. As I understand, he does not speak Spanish and he only speaks his own native Hmong language. I just want to make sure I understand your relationship. Quite obviously, he has a problem getting a job because he doesn't speak Spanish, but he does have a problem in a certain sense. So does his inability to speak Spanish limit his work opportunities in Guatemala? And if so, is this really a part of the analysis? Where do you see it doesn't fit that he should receive the benefits because he is unable to work due to his Hmong language and Hmong is a religious position for him that isn't going to change? I'm not sure I made that clear because I didn't understand it too well myself. But it strikes me that it's a point that I'd like to have your view on. Your Honor, petitioner has actually stated before that he does speak Spanish. Indeed, when he testified to the incident where he was robbed driving the cab, he stated he did speak Spanish. When he drove the taxis and the buses, that was in Guatemala City, you know, which is not a, you know, solely indigenous area. So the passengers and all, they would have been speaking Spanish as well. So he has been able to function in the Spanish-speaking society. So petitioner actually does have a history of speaking Spanish. You know, his native language is Hmong, but he has worked in Guatemala all of those years, you know, in a predominantly Spanish-speaking society. Additionally, this issue of whether petitioner could internally relocate within Guatemala, the court does not need to reach that issue even because the court could deny the petition for the previous reasons stated, such as that petitioner has not demonstrated a nexus between protected ground and the harm he suffered. In this case, his Hmong race or a cognizable particular social group. But he also raises an issue we hadn't talked about yet, and that is his father's sale of the land. And he claims that it wasn't so much a forced sale, but because the father was Hmong and they were targeted in the Civil War, that it was tantamount to a forced sale because he had to flee and he had to sell the land. Is there, what kind of cognizance does the BIA give to that argument? Your Honor, the evidence for that argument is not clear because petitioner also testified that he does not know how the land was sold. Petitioner also did not elaborate on what specifically was the reason that the land was sold. Indeed, there were other reasons provided for the land being sold, including that petitioner's father left in 1982 to Mexico because of the Civil War in Guatemala. That affected, you know, everyone living in the country and many people went to Mexico instead. Although there was some evidence in the various human rights reports that the indigenous communities were targeted during that Civil War, right? Your Honor, I see that I am out of time. You know, you can answer the question. Yes, Your Honor. Yes, that is so. However, the record evidence still does not demonstrate that this in particular was because of petitioner's father being Hmong. Indeed, it seems to be that petitioner more so is speculating about possible reasons for the sale. We don't have any evidence from petitioner's father about the sale of the land. And, you know, recognizing I'm, you know, over time here. But again, there is the record does not have sufficient evidence to show why exactly the land was sold. And there are other reasons for the land being sold in the evidence, such as that petitioner's father moved in 1982. He sold the land in 1986, presumably because he wasn't living on the land anymore. And that is not related to a protected ground. And to summarize and to end, Your Honors, the case also should not be remanded for matter of Fernandez because petitioner's argument on that issue is unexhausted, as is further explained in respondent's brief. Also, even if it were to be remanded, petitioner would not be eligible for any relief under matter of Fernandez because he did not raise the claims processing issue before the close of proceedings, which is when it would be considered timely. So for the reasons stated in respondent's brief and here at today's argument, respondent would request that the petition for review is denied. Thank you, Your Honors. Thank you, counsel. May it please the court. Petitioner's already addressed the issue on Fernandez and the remand and why it is that the petitioner, that this court should issue a bright line rule that provides everyone with an understanding of what it is that it means by before the expiration of those proceedings. And that bright line rule should be one that requires it after the issuance of the PREA because the regulation controlled before that. As for the sale of the land, the Human Rights Report does explain to us that during the Civil War, the indigenous communities were particularly targeted by the Guatemalan government for persecution because there was an implication that the indigenous community were the ones that were supporting the sale of the land. And there was an implication that they were supporting the revolution, the guerrillas as they called them at the time, an application that wasn't true. So individuals like petitioner's father had to flee to Mexico in this case because they were being persecuted by the Guatemalan government because this implied or you could say imputed political belief that they were supportive of the guerrillas. So I respectfully disagree. I think there is good evidence. It's even in the DHS or the State Department's Human Rights Report. It's correct to say that the petitioner wasn't there and didn't speak to his father when his father sold the property. But that doesn't mean there isn't relevant information in the record that supports the petitioner's position. Can you imagine an indigenous community that's already being denied education, denied food and malnutrition is extremely, most people die of malnutrition in these indigenous communities. In fact, that's the way his father died was of malnutrition because he was an indigenous member living in an indigenous community. And with that, I'll submit, Your Honor. I thank you, counsel. Thanks to both of you for your briefing and argument in this case. Very well done. This matter is submitted and we'll move on to the next case on our calendar this morning.
judges: WALLACE, McKEOWN, OWENS